UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
IN RE RAMP CORPORATION SECURITIES    :        05 CIV. 6521 (DLC)
LITIGATION                           :
                                     :        <u>OPINION & ORDER</u>
This Document Relates to:            :
                                     :
All Actions                          :
                                     :
------------------------------------ X

Appearances:

For Lead Plaintiffs Mark Lorenzo,
Vincent Coluccio, and Brian Steele:
Jacqueline Sailer
Gregory Linkh
Murray, Frank & Sailer LLP
275 Madison Avenue, 8th Floor
New York, NY 10016

For Defendant Andrew Brown:
Jay Fialkoff
Ruth Haber
Moses & Singer LLP
450 Lexington Avenue
New York, NY 10174

For Defendant Darryl Cohen:
Sarah Good
Jason Takenouchi
Howard Rice Nemerovski Canady Falk &
Rabkin
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

Steven Popofsky
Gersten, Savage, Kaplowitz, Wolf &
Marcus, LLP
600 Lexington Avenue, 9th Floor
New York, NY 10022

For Defendant Mitchell Cohen:
Dean Yuzek
Robin Singer
Ingram Yuzek Gainen Carroll &
Bertolotti
250 Park Avenue, 6th Floor
New York, NY 10177

For Defendant Ron Munkittrick:
Michael Devorkin

Golenbock Eiseman Assor Bell & Peskoe
LLP
437 Madison Avenue, 35th Floor
New York, NY 10022

For Defendant Jeffrey Stahl:
Steven Popofsky
Gersten, Savage, Kaplowitz, Wolf &
Marcus, LLP
600 Lexington Avenue, 9th Floor
New York, NY 10022

For Defendant BDO Seidman LLP:
Ira Greenberg
Cathy Fleming
Joseph Czerniawski
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue, 8th Floor
New York, NY 10022


DENISE COTE, District Judge:

On June 3, 2005, Ramp Corporation ("Ramp") filed for bankruptcy. Securities class action complaints against Ramp officers and its auditor, BDO Seidman LLP ("BDO"), followed swiftly. Having been unable to locate any false statement regarding Ramp's financial condition in either of the annual financial statements audited by BDO, plaintiffs have alleged other misstatements and omissions which they contend violated the federal securities laws. With one exception, all the plaintiffs' claims must be dismissed, largely for their failure to allege loss causation. Because they have been given ample opportunity to amend their pleadings, those claims that are dismissed, are dismissed with prejudice.


<u>Background</u>

Three class action lawsuits were filed between July 19 and

September 16, 2005, pleading securities law violations against

Ramp executives and BDO.  An Order of October 18, consolidated

the actions, appointed lead counsel for the putative plaintiff

class, and required lead counsel to file a consolidated amended

complaint by December 16 ("Consolidation Order").[1]  The

Consolidation Order also scheduled motions to dismiss.  In a

letter dated March 9, lead counsel notified the Court that it was

seeking the defendants' consent to file a second consolidated

amended complaint ("Complaint").  The Court required the lead

plaintiffs to attach the proposed pleading to their opposition to

the pending motions to dismiss, which was due shortly thereafter.

As a consequence, plaintiffs have opposed the motions to dismiss

with their own motion to amend.  The individual defendants

("Individual Defendants") and BDO oppose the amendment, arguing

that it is futile and does not cure the deficiencies identified

---

[1] The Consolidation Order appointed Murray, Frank & Sailer
LLP as Lead Counsel.  Among the responsibilities given to Lead
Counsel was the responsibility to "[b]rief and argue motions."
Despite the clear terms of the Consolidation Order, the
plaintiffs' briefs list the following additional counsel:

Jeffrey Abraham
Lawrence Levit
Abraham Frutcher & Twersky LLP
One Penn Plaza, Suite 2805
New York, NY 10119

Bruce Murphy
Law Offices of Bruce Murphy
265 Llwyds Lane
Vero Beach, FL 32963

Adhering to the Consolidation Order, the only appearance of
counsel for lead plaintiffs that will be recognized is that of
counsel from Murray, Frank & Sailer LLP.

3

in the motions to dismiss.  The motion to amend is granted, and this Opinion shall address the motions to dismiss in the context of the most recent articulation of the plaintiffs' case.

The Complaint brings two claims under the Securities Exchange Act of 1934 (the "Exchange Act"): a claim under Section 10(b), and a claim under Section 20(a).  Both claims are brought on behalf of a class of purchasers of Ramp securities between December 18, 2002 and May 20, 2005 (the "Class Period").  Taken with the documents that are integral to the Complaint, it alleges the following.

Ramp was touted as a risky, high tech company that faced a long road to profitability.  Its technology, which was designed to enable doctors and others providing health care services to communicate prescriptions as well as laboratory orders and results electronically, was aimed at saving health care costs for both doctors and patients, and held out the promise of reducing errors in the filling of prescriptions.  Ramp's stock was listed on the American Stock Exchange ("AMEX").

The Individual Defendants include Darryl Cohen ("Cohen"), who joined Ramp as its President and CEO in 2002.  Cohen became Chairman of the Board in October 2003.  Defendant Mitchell Cohen became Executive Vice President, CFO and Secretary of Ramp in November 2003.  Defendant Andrew Brown ("Brown") joined Ramp in October 2003 as President, COO and a Director.  Defendant Jeffrey Stahl ("Stahl") was a Director from October 2003 to June 2005, and a member of its Audit Committee in 2004.  The last Individual

4

Defendant is Ron Munkittrick, who was hired as CFO in October 2004.

A.   Private Placements

Ramp raised money through private investment, public equity transactions known as PIPEs.  A PIPE is the purchase by a private investor of stock at a discount to the current market value.  A "structured PIPE" issues debt which can be converted into either common or preferred shares.  PIPEs are ordinarily exempt from registration under Section 4(2) of the Securities Act of 1933 ("Securities Act").  According to the Complaint, if an investment in a company is made through a PIPE transaction while the company has an S-3 registration statement pending, then the private placement is subject to Section 5 of the Securities Act and may be rescinded by the investor.[2]  The investors have the option of receiving their money back or proceeding with a resale of their shares.

On February 13, 2003, Ramp filed an S-3 registration statement to register over 22 million shares on behalf of selling shareholders who had previously acquired shares in PIPEs.  The S-3 became effective on May 14.  Thus, according to the Complaint, the period from February 13 to May 14 was a black-out period during which time Ramp could not lawfully sell stock without a registration statement.  Nonetheless, despite that restriction,

_____

[2] The defendants contest the accuracy of the Complaint's description of the law.  They also point out that no PIPE investor in Ramp sought rescission.

on May 15, Ramp filed its first quarter 2003 Form 10-Q, which disclosed an April 2003 private placement of $400,000 in convertible notes. The Complaint asserts that this filing should have also disclosed that the private placement was entered into during the black out period, had been "consummated in violation of the Securities Act," and that the shares and investment funds were subject to the investors' right of rescission. The Complaint alleges that there were a series of illegal PIPE transactions in 2003 and repeated failures to make appropriate disclosures about the PIPE transactions in SEC filings during that year and the following year.

B.    Change in Auditors

Ramp changed auditors in June 2003. The outgoing auditors were Erhardt Keefe Steiner & Hottman, PC ("EKS&H"). A press release announcing the termination of the relationship acknowledged that EKS&H had advised Ramp of "reportable conditions which related to controls over documentation for certain of the Company's equity transactions and accounting for certain exit costs associated with office closings." The company added that it had hired new personnel and reorganized its accounting records to address these issues. BDO replaced EKS&H.

C.    August 2003 Press Release: Serca

Ramp had announced in June 2003 that it was entering into a letter of intent to purchase Serca, a technology company. By

August, Ramp concluded that Serca's technology was flawed, and it announced in a press relase that it was pulling out of the deal but would still purchase technology from Serca.  This was a waste of corporate resources and the press release falsely described Ramp's assessment of the Serca technology.  Ramp squandered money by trying to integrate the Serca technology with its own.

D.    2003 SEC Inquiry

On September 22, 2003, the SEC sent Ramp a letter asking why Ramp had not included later offerings in its Form S-3.  The additional offerings had been disclosed in the 2d Quarter Form 10-Q and an amended Form S-3.  Certain people associated with Ramp held an emergency meeting to address the concerns expressed by the Saltsman Group, an investor in Ramp, about the proper response to this inquiry.  The Saltsman Group did not want to disclose their private placement to the SEC, fearing that a disclosure would delay registeration of their shares for resale.

Seeking to hide the existence of the private placement, Ramp responded to the SEC letter on September 26 with the statement that "the disclosure in previously filed amendments to the Registration Statement was drafted in such a way that the [SEC] Staff was likely to assume that an offering was ongoing.  We apologize for the confusion caused by prior counsel's draftsmanship."  This response to the SEC was engineered by defendant Brown and outside investors.  At that time, Brown was a paid consultant and not a member of management.  The extent of

7

control exercised by outside investors over Ramp, as evidenced by this and other events, was not disclosed to Ramp shareholders through any public filing.

E.    October 2003: Brown joins Ramp

On October 7, 2003, Brown was elected to the Board of Directors.  On October 15, Ramp issued a press release announcing Brown's selection as Ramp's new President and COO.

F.    November 2003 Press Release

On November 3, 2003, Ramp issued a press release announcing that it had approximately "500 active users" of its technology and that over "400 additional physicians" were in the process of installing the technology.  In fact, Ramp had only 100 doctors signed up as of January 2004.  In response to the press release, the price of Ramp stock jumped from $27 to $48 within a few days.

G.    Drugstore.com

Ramp was developing a system to allow physicians to show patients which pharmacy would give the patient the lowest price on drugs.  Cohen "made it clear" to senior management that they could lie to pharmacies about the number of physicians who had joined Ramp's programs in order to sign up pharmacies as participants.  As a result of this scheme, the company drugstore.com was falsely told that over 5,000 doctors were using Ramp's technology and it agreed to participate in Ramp's

CarePoint program.  The agreement with drugstore.com was announced through a December 11, 2003 press release.

H.    December 2003 Cash Gift to Brown

An advisor to Ramp investors paid Brown a cash gift in December 2003.  Brown kept this gift secret until the Spring of 2005.  The SEC and FBI are currently investigating this gift.

I.    March 2004: Brown Replaces Cohen

In the Spring of 2004, independent directors of Ramp decided to fire Cohen and have Brown run Ramp until a more qualified successor could be found.  Trying to save his job, on March 8, Cohen made a written presentation to the Board.  He admitted that as of January 2004, only 100 doctors had signed up for Ramp's e-prescribing programs.

Brown worked with a private investor in Ramp, Hilltop Partners ("Hilltop"), to force the ouster of independent directors and save his job.  Colluding with Brown, Hilltop wrote to Ramp on March 23, demanding the immediate return of its investment unless misrepresentations made by Ramp to Hilltop were addressed.  Hilltop then demanded that the independent Audit Committee members resign or Hilltop would sue the Board.  The independent directors resigned.  On April 26, Ramp announced that Cohen had resigned and that Brown had been appointed CEO and Chairman of the Board.  It "falsely" described Brown's prior experience when it failed to disclose that Brown had received a

cash gift from an advisor to a Ramp investor.

Because of Hilltop's influence over Ramp, it was required to file a Form 13-D.  Because that filing was not made, the public was unaware of Hilltop's power over the Board.

J.    2003 Form 10-K

On April 14, 2004, Ramp filed its Form 10-K for 2003.  It incorporated financial statements, which reported massive losses, that were certified by BDO.  The certification included BDO's assessment that the financial statements "present fairly, in all material respects, the financial position of Ramp Corporation and subsidiaries at December 31, 2003... in conformity with accounting principles generally accepted in the Unted States of America."  The Complaint alleges that the certification was false because "Ramp's management lacked integrity, and therefore, its representations, upon which BDO based its opinion, could not be relied upon."

The BDO certification continued with a warning that Ramp "has experienced significant recurring losses from operations and has a working capital deficit at December 2003 that raise substantial doubt about its ability to continue as a going concern....  The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty."

The Section 302 certifications[3] that accompanied the Form 10-K and that were signed by Cohen and Mitchell Cohen should have disclosed that Hilltop had accused the Board of fraud, and that the accusation had resulted in the resignation of the Audit Committee members. The Form 10-K should also have disclosed that Hilltop owned 8.3% of Ramp's outstanding shares, and had exercised control by changing the composition of the Board. And, for the reasons described above, it should have disclosed those 2003 transactions in which Ramp had issued stock under a Section 4(2) exemption while an S-3 registration statement was pending.

K.    April 2004 Stock Decline

With the filing of the 2003 Form 10-K, which disclosed the company's abysmal financial results and BDO's going-concern warning, and with the shake-up in management and the Board of Directors, Ramp's stock price dropped from over $37 to under $23 within a period of just fourteen days.

L.    May 2004 Form 10-Q

The 1st Quarter 2004 Form 10-Q reported that BDO had advised management of reportable conditions during 2003 and into 2004, including problems with Ramp's accounting staffing, records and

---

[3] Section 302 of the Sarbanes-Oxley act, 15 U.S.C. 7421, requires principal executive and financial officers to certify each annual and quarterly report. Section 302's requirements have been enacted through Exchange Act Rule 15d-14. Reports of Registrants Under the Securities Act of 1933, 17 C.F.R. § 240.15d-14.

controls. BDO had assured the Audit Committee that it had taken these conditions into account when performing its 2003 audit of the company. The company acknowledged that its contols and procedures remained inadequate, but noted that in November 2003 it had hired a CFO with public company accounting experience and was looking for an experienced financial reporting manager. Subsequent Form 10-Qs made similar disclosures.

M.    Mitchell Cohen resigns

On September 8, 2004, Mitchell Cohen resigned. He was motivated to do so by his belief that Ramp was engaging in illegal activities.

N.    September 13 Notice by AMEX

On September 13, Ramp was notified by AMEX that as a result of its substantial and sustained losses, it was not in compliance with AMEX rules and did not appear able to continue its operations. By then, Ramp's stock price had fallen to $3 per share. Ramp submitted a compliance plan to AMEX, which was accepted on December 16, 2004. It required Ramp to comply with AMEX rules by March 13, 2006, or lose its listing.

O.    October 2004 Press Release: Berdy Medical Systems

In April 2004, Ramp had announced the existence of a letter of intent to purchase Berdy Medical Systems, the publisher of SmartClinic point-of-care software. The purchase of Berdy was

announced in an October 28, 2004 press release.  The press
release was false when it described the technology of the two
companies as compatible.

P.    2004 Form 10-K

When it issued its certification of the Ramp 2004 annual
financial statements, which was filed with Ramp's Form 10-K, BDO
noted that Ramp "is not required to have, nor were we engaged to
perform, an audit over its internal control over financial
reporting.  Our audits included consideration of internal control
over financial circumstances, but not for the purpose of
expressing an opinion on the effectiveness of the Company's
internal control over financial reporting.  Accordingly, we
express no such opinion."

The 2004 certification opined that Ramp's financial
statements, which again reported massive losses, present "fairly,
in all material respects, the financial position of Ramp."  It
again included a warning about Ramp's ability to continue as a
going concern.

Q.    Disclosure of Gift to Brown; Resignation of BDO

On May 16, Brown informed the Board that he had received an
unsolicitied gift of cash from an advisor to several Ramp
investors in December 2003, at a time when he was the President
of Ramp.  Brown asserted that he had discarded the money within
days of receiving it.  On May 21, after learning of Brown's

disclosure, BDO resigned as auditor.  Brown resigned from Ramp the next day.

On May 26, Ramp issued a press release stating that it would not timely file its quarterly report for the first quarter.  As a result, it defaulted on over $6 million it had received in private placements in early 2005.

BDO informed the SEC in a letter dated June 3, that Brown's receipt of a cash gift and his failure to take prompt and appropriate action cast doubt "on mangement's integrity."  Since mangement's representations "were an integral component of our audits," BDO was no longer willing to be associated with the financial statements prepared by management.  BDO withdrew its audit reports for the years 2003 and 2004.

R.    Bankruptcy Filing

On June 2, 2005, Ramp filed for reorganization under Chapter 11.  On June 6, AMEX delisted Ramp's stock.  Trading in the stock was halted.  On June 15, when trading reopened, the stock closed at 19 cents.

S.    BDO's Audit Failures

The Complaint asserts that BDO failed to conduct its audit in accordance with Generally Accepted Accounting Standards, or "GAAS", when it turned a blind eye to indicators of fraud, which it terms red flags.  It asserts that, with an appropriate investigation, BDO should not have accepted the engagement or

issued unqualified audit reports.

In particular, BDO should have known that Ramp had a reportable condition regarding stockholder equity transactions in connection with the PIPE transactions discussed above. In addition, in the third quarter of 2003, Ramp's financial records reflected a sudden decrease in cash, and an increase in long term notes payable in the amount of $1.4 million. This change was made to conceal the fact that Ramp had already received money from an equity transaction involving unregistered stock while an S-3 registration statement was pending. This change should have led BDO to make additional inquiries. Had it done so, this would have led it to question the integrity of management and the reliability of internal financial controls at Ramp. In particular, if BDO had inquired further into the private placements, it would have learned that Ramp had misrepresented the transactions in its September 2003 correspondence with the SEC.

The Complaint identifies over a dozen red flags that should have alerted BDO to the likelihood of fraud. Grouped into five categories, they include (1) the pressures on Ramp to meet the requirements of investors, to keep stock price up or face delisting, and to inflate the number of doctors joining its programs; (2) the revelation in March 2005 that in October 2003 Darryl Cohen had encouraged management to lie about the number of physicians joining Ramp's programs; (3) the composition of the Board and the company's management, including the domination of

management by a small group including Brown, Cohen's abdication of his responsibilities as CEO and the power struggle between Cohen and Brown, the Board's removal of Cohen and then Brown, the shifting membership on the Board of Directors and Ramp's senior management, and Hilltop's ability to effect changes in Ramp's mangagement structure; (4) Ramp's inadequate internal controls; and (5) Ramp's inability to control spending.


## Discussion

The defendants have moved to dismiss both claims in the Complaint.  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed. R. Civ. P.  The purpose of this requirement is to give fair notice of a claim and the grounds upon which it rests so that the opposing party may identify the nature of the case, respond to the complaint, and prepare for trial. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002).  Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff."  Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627, 1634 (2005).  "The complaint thus need not set out in detail the facts upon which the claim is based."  Twombly v. Bell Atlantic Corp., 425 F.3d 99, 107 (2d Cir. 2005) (citation omitted).  If it is clear, however, that "no relief could be granted under any set of facts that could be proved consistent

with the allegations," the claim should be dismissed.

_Swierkiewicz_, 534 U.S. at 514.  In construing the complaint, the court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff."  _Jaghory v. New York State Dep't of Educ._, 131 F.3d 326, 329 (2d Cir. 1997).

"The Rules do establish more demanding pleading requirements for certain kinds of claims."  _Twombly_, 425 F.3d at 107.  These claims, including fraud, must "be stated with particularity." Rule 9(b), Fed. R. Civ. P.  To comply with the requirements of Rule 9(b), an allegation of fraud must: "(1) detail the statements (or omissions) the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statement (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  _Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y._, 375 F.3d 168, 187 (2d Cir. 2004). When pleading scienter as part of a fraud claim plaintiffs "must allege facts that give rise to a strong inference of fraudulent intent."  _Id._ (citation omitted).

A.   Section 10(b)

Section 10(b) of the Exchange Act is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith.  _Ernst & Ernst v. Hochfelder_, 425 U.S. 185,  206 (1976).  Section 10(b) provides that:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce or of the mails, or of any
facility of any national securities exchange - . . .

(b) To use or employ, in connection with the purchase
or sale of any security registered on a national
securities exchange or any security not so registered,
. . . any manipulative or deceptive device or
contrivance in contravention of such rules and
regulations as the Commission may prescribe as
necessary or appropriate in the public interest or for
the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, the parallel regulation,

describes what constitutes a manipulative or deceptive device and

provides that it is unlawful for any person, directly or

indirectly:

(a) To employ any device, scheme, or artifice to
defraud,
(b) To make any untrue statement of a material fact or
to omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading, or
(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person, in connection with the purchase
or sale of any security.

17 C.F.R. § 240.10b-5; <u>see also</u> <u>Press v. Chem. Inv. Servs. Corp.</u>,

166 F.3d 529, 534 (2d Cir. 1999).  Plaintiffs' first claim arises

under Section 10(b) and Rule 10b-5 of the Exchange Act.

To state a cause of action under Section 10(b) and Rule 10b-

5 a plaintiff must allege that "the defendant, in connection with

the purchase or sale of securities, made a materially false

statement or omitted a material fact, with scienter, and that

plaintiff's reliance on defendant's action caused injury to the

plaintiff." <u>Lawrence v. Cohn</u>, 325 F.3d 141, 147 (2d Cir. 2003);

18

see also <u>Starr ex rel. Estate of Sampson v. Georgeson S'holder,</u>
<u>Inc.</u>, 412 F.3d 103, 109 (2d Cir. 2005).  Section 10(b) claims
sound in fraud, and must satisfy the pleading requirements of
Rule 9(b), Fed. R. Civ. P., and the Private Securities Litigation
Reform Act of 1995, 15 U.S.C. § 78u-4.  <u>See</u> <u>In re Scholastic</u>
<u>Corp.</u>, 252 F.3d 63, 69-70 (2d Cir. 2001).


1.   BDO

     BDO is only named in the Section 10(b) claim.  For the
following reasons, its motion to dismiss is granted, and the
claim against it is dismissed with prejudice.

     BDO certified its audit of the Ramp annual financial
statements for the years 2003 and 2004.  In each instance the
financial statements reported millions of dollars of losses and
negligible revenue.  Both of BDO's certifications included a
"going concern" paragraph, whose inclusion the plaintiffs assert
contributed to a substantial decline in the price of Ramp's stock
in 2004.  BDO has moved to dismiss the securities fraud claim
brought against it because it fails to allege that BDO made a
false statement in either of its certifications, and because the
Complaint does not allege either loss causation or BDO's
scienter.


     a.  Material False Statement

     The plaintiffs concede that they have not alleged that
Ramp's financial statements for the years ending 2003 or 2004

19

contained a false statement. Specifically, they acknowledge that they "are not alleging that particular segments of the financial statements under the audit are incorrect." Instead, the plaintiffs assert that BDO's certification of those financial statements contained a misstatement when the certifications asserted that BDO had conducted its audits in compliance with GAAS. The plaintiffs contend that BDO could not have reasonably relied upon the integrity of management because red flags should have alerted BDO to management's lack of integrity, in particular the illegal private placements, the turnover in the membership of the Audit Committee and the CFO and CEO positions, and Ramp's lack of internal financial controls.

The plaintiffs' failure to identify a material misrepresentation of Ramp's financial condition in its audited financial statements for the years 2003 and 2004 requires dismissal of the Section 10(b) claim against BDO. Without a material false statement in the company's financial statements, the quality of the audit performed by BDO is immaterial. Compliance with GAAS is relevant only insofar as it provides the investing public with a level of assurance that the financial statements accurately reflect the company's financial position when measured against Generally Accepted Accounting Procedures or "GAAP". See In re WorldCom Sec. Litig., 352 F. Supp. 2d. 472, 495 (S.D.N.Y. 2005); In re WorldCom Sec. Litig., 346 F. Supp. 2d. 628, 664 (S.D.N.Y. 2004). If the financial statements accurately disclose the financial condition when measured against GAAP, then

the investing public has received all that it is entitled to receive from the auditor certifying its audit of those financial statements.

In any event, the plaintiffs have not pleaded a failure by BDO to comply with GAAS. See Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 1 (Am. Inst. of Certified Pub. Accountants 2002).[4] Under AU 316, an auditor is required "to plan and perform the audit to obtain reasonable assurance about the whether the financial statements are free of material misstatement, whether caused by fraud of error." AU § 316. Having failed to identify a misstatement in the financial statements, much less one caused by either error or fraud, plaintiffs have not adequately pleaded that BDO's representation that its audit complied with GAAS was false.

Plaintiffs' theory of BDO's liability appears to rest on its assumption that an auditor's certification that a company's financial statements comport with GAAP, is also a representation about the integrity of management. Plaintiffs have not pointed, however, to any statement in the certification that makes such a representation. Nothing in GAAS requires such a representation. And, following changes in the format of an audit certification that accompanied directives from the Public Company Accounting Oversight Board, see Auditing Standard No. 2 Approval Order, Exchange Act Release No. 34-49884, 83 SEC Docket 212 (June 17,

---

[4] GAAS and the related Statements on Auditing Standards are here cited as AU § __ .

2004), BDO's certification of the 2004 financial statements expressly disclaimed that it had conducted an audit of Ramp's internal controls.

   b.   Loss Causation

   In order to state a claim plaintiffs must allege loss causation. <u>See</u> <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 172 (2d Cir. 2005). "Loss causation is the casual link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." <u>Id.</u> (citation omitted). To plead loss causation "a plaintiff must allege that the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered, <u>i.e.</u>, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Id.</u> at 173 (citation omitted). The Second Circuit's cases on loss causation require "both that the loss be foreseeable <u>and</u> that the loss be caused by the materialization of the concealed risk." <u>Id</u>. at 173.

   "[N]ormally . . . an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 342 (2005). Unless plaintiffs can allege that their losses were attributable to some form of revelation to the market of wrongfully concealed information, they are not recoverable in a private securities action. Such actions are available, after all, "not to provide investors with broad insurance against market losses, but to

protect them against those economic losses that

misrepresentations actually cause." <u>Id.</u> at 345.

The plaintiffs rely on a single paragraph of the Complaint

as their allegation of loss causation.[5]  It reads,

> Upon disclosure of the news that BDO had resigned and
> that its financial statements for 2003 and 2004 were
> unreliable, trading in Company's stock was halted for
> several weeks.  On June 15, 2005, when Ramp began
> trading again, it closed at $0.19, a substantial drop
> from the previous trading day's close of $1.25.

Thus, the plaintiffs' theory of loss causation is tied to

the disclosures made in early June 2005 that BDO had resigned as

Ramp's auditor and had withdrawn its certifications of its audits

of the 2003 and 2004 annual financial statements.  The Complaint

asserts that BDO's June 3 letter to the SEC explaining its

resignation was made public as an attachment to a Form 8-K on

June 8, 2005.  The letter stated that BDO had learned on May 20

of Brown's 2003 cash gift, and that Brown had reported he had

"destroyed" this gift.  It also described BDO's conclusion that

the receipt of the gift and lack of prompt and appropriate action

led BDO to doubt its ability to rely on management's integrity

and representations, which "were an integral component of our

audits."

The other public statements that are alleged to have been

made at about this same time do not, however, relate as directly

to BDO.  The other significant public announcements from this

---

[5] The plaintiffs' opposition to the motion to dismiss cites
a paragraph from the December 19 Complaint, which is identical to
the equivalent paragraph from the Complaint quoted above.

period that are described in the Complaint include: the May 26 press release reporting Ramp's inability to timely file its first quarter Form 10-Q and Brown's resignation four days earlier in connection with the internal investigation of whether he had violated Ramp policies or the law because of the gift he received in 2003; Ramp's June 2 filing for bankruptcy; and a June 10 announcement that AMEX had delisted Ramp's stock on June 6.

The Complaint fails to plead loss causation as to BDO. As alleged in the Complaint, BDO resigned from the engagement when it learned that Brown had received a gift of cash and that he had failed to disclose the gift for over a year. Based on its assessment that it could no longer rely on the integrity of management, BDO also withdrew its audit opinions for 2003 and 2004. Taking all appropriate inferences in the plaintiffs' favor, this still does not allege that a fact known to and concealed by BDO caused the price of the stock to drop by approximately $1. There is no allegation that BDO knew or was reckless in not knowing of the gift before May 2005.

While plaintiffs assert that it is "irrelevant" whether BDO was previously aware of Brown's gift, they are wrong. "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk <u>concealed</u> by the misrepresentations and omissions alleged by the disappointed investor." <u>Lentell</u>, 396 F.3d at 173; <u>see</u> <u>also</u> <u>In re WorldCom Sec. Litig.</u>, 02 Civ. 3288 (DLC), 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005). If BDO was unaware of

24

Brown's gift, then BDO cannot be said to have concealed it, either through misrepresentation or omission. Whether analyzed as a failure to plead loss causation as an element of its claim against BDO or a failure to plead BDO's scienter as to the only omission that can be said to have caused the loss identified by the plaintiffs, the result is the same. The plaintiffs have failed to plead a claim against BDO.

There is one additional theory of loss causation to consider. The plaintiffs also assert that BDO's disclosure "revealed that Ramp's management lacked integrity generally." The plaintiffs contend that there were enough red flags to put BDO on notice that Ramp's management was not to be trusted, and that if BDO had complied with its obligations under GAAS it would never have certified the financial statements of the company, indeed that it would have refused the engagement altogether. The reasoning goes, if there had been no audit opinions to withdraw, then this loss would not have occurred.

This second theory also fails to allege loss causation, essentially for the reasons already discussed in connection with the plaintiffs' inability to identify any misrepresentation of Ramp's financial condition in the certified financial statements. Because the withdrawal of the audit opinions was not connected to the discovery of a misrepresentation in the financial statements, or indeed any of the items identified as "red flags," BDO's withdrawal of its certifications of the audits of those financial statements cannot be said to have caused the plaintiffs' loss.

In certifying the audits, BDO did not vouch for the integrity of management; its certification was addressed instead to the degree to which those financial statements comported with GAAP when audited with the degree of care mandated by GAAS. The stock price decline in May and June 2005 is not alleged to have been caused by any revelation of a misstatement in those financials of Ramp's financial condition.

The plaintiffs purport to rely on this Court's decision in In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005), but it does not suggest another outcome. In WorldCom the plaintiff class resisted a motion for summary judgment brought by accounting firm Arthur Andersen by arguing, inter alia, that Andersen's "over-reliance on the integrity of management and a failure to maintain its own independence" contributed to a "reckless disregard of whether WorldCom was engaged in fraudulent accounting practices and materially misstating its financial position." Id. The eventual disclosure of those material misstatements amply supported loss causation for plaintiffs' claims. Here, as already explained, there is no allegation of a misrepresentation of Ramp's financial position. Similarly, in Winstar Commc'ns v. Rouhana, 01 Civ. 3014 (GBD), 01 Civ. 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006), plaintiffs alleged that financial statements had been materially inflated, and that the audit conducted by the defendant accounting firm was flawed and concealed the accounting fraud, which when revealed led to the investors' losses. Id. at

    c.  Scienter

    BDO also asserts that plaintiffs have failed to plead its
scienter with the particularity required by the law.  It is
unnecessary to reach this additional argument since the Section
10(b) claim is deficient in the two ways just discussed.  In any
event, because the plaintiffs have failed to identify a material
misrepresentation that can be properly attributed to BDO, it is
nigh impossible to analyze the extent to which the Complaint
adequately alleges that BDO knew of or was reckless as to the
fraudulent nature of an actionable misrepresentation.


2.  Individual Defendants

    In their memorandum in opposition to the motions to dismiss
made by the Individual Defendants, the plaintiffs identify five
statements or omissions which they contend support their claims
of securities fraud by these defendants.  They emphasize a
theory, introduced in the recently filed Complaint, that the
company's Forms 10-Q and 10-K should have disclosed that Ramp had
entered into private placements of unregistered securities in
violation of the Securities Act.  As already described above,
they contend that the private placements or PIPEs were not exempt
from registration pursuant to Section 4(2) of the Securities Act
because they were entered into when there was a pending S-3
registration statement.  As a result, the private placements were

allegedly subject to rescission, and an investor had the option of receiving money back up until the time the investor elected to proceed with the resale of the shares received through the private placement.

The remaining false statements can be described more succinctly. The plaintiffs also allege that the 2003 Form 10-K was misleading when it failed to disclose arrangements to change the membership of the Board of Directors and to replace key executives and Hilltop's control over these decisions. The plaintiffs allege that Darryl Cohen issued a false press release in November 2003 when he proclaimed that Ramp was approaching its 1,000[th] doctor participant even though only 100 doctors (at most) had signed up as of that time. The plaintiffs assert that the press releases associated with the acquisitions of Serca and Berdy or their assets were misleading in that they failed to reveal that Ramp had not conducted adequate due diligence in connection with those acquisition decisions. Finally, the plaintiffs assert that the SEC filings that followed December 2003 were false to the extent that they failed to disclose that Brown had accepted a bribe from an advisor to a Ramp investor.

The Individual Defendants have made many arguments in support of their motions to dismiss, but it is only necessary to address one of them. The plaintiffs have not alleged loss causation except as to the failure to disclose the bribe paid to Brown.

As already noted, the plaintiffs assert loss causation based

on BDO's resignation as Ramp's auditor in May 2005 and its
withdrawal of its two audit opinions.  There is no allegation in
the Complaint that there was any public disclosure at that time
related to the private placements, the exercise of control by
Hilltop and associated management changes in the Spring of 2004,
the number of doctors who had joined Ramp's programs, or the
plans to acquire Serca and Berdy or their assets, or the impact
of those decisions on Ramp's operations.  Thus, the only alleged
misrepresentation or omission that is connected to the alleged
loss was the concealment of the bribe paid to Brown.

    The plaintiffs seek to incorporate all of the alleged
omissions into their loss causation claim with the following
assertion.  They argue that the May/June 2005 disclosures of the
bribe were essentially a disclosure of management's lack of
integrity, and therefore, that any concealment of a fact that
related to a lack of integrity can support the allegation of loss
causation.  This sweeps too broadly.  There must be a sufficient
connection between the disclosed fact and the alleged loss to
plead causation from the disclosure.  While the disclosure of the
bribe reflected on Brown's (and thereby management's) integrity,
there was no disclosure of these other events such that they
could be said to have caused the drop in the price of the stock.
The risks allegedly associated with these other events and
concealed from the public did not materialize and cause the
decline in shareholder value.  See Lentell, 396 F.3d at 174.
Because there is no scienter allegation as to any defendant but

Brown with respect to the bribe paid to Brown, the Section 10(b) claims against all Individual Defendants except Brown may be dismissed without further discussion.

Brown contends that he is entitled to have the claims against him dismissed principally because the stock had lost most of its value prior to the disclosure of the bribe, the plaintiffs have not pleaded a violation of Ramp's code of ethics with sufficient specificity, a violation of the company's code of ethics (by failing to disclose the bribe) is not a violation of the securities law, Brown had no duty to disclose the bribe, other events besides the disclosure of the bribe also caused the stock to fall, that the connection between the disclosure of the bribe and the fall in the price of the stock was too attenuated, and the Complaint does not allege his scienter. There is only one of these arguments that requires any discussion.

Brown contends that he did not have any duty to disclose a violation of the company's code of ethics or violation of federal criminal law. There is no general duty under SEC regulations to disclose uncharged illegal conduct. See, e.g., Roeder v. Alpha Indus., Inc., 814 F.2d 22, 27 (1st Cir. 1987); United States v. Matthews, 787 F.2d 38, 49 (2d Cir. 1986); United States v. Crop Growers Corp., 954 F. Supp. 335, 347 (D.D.C. 1997). This rule reflects the underlying principle that "so long as uncharged criminal conduct is not required to be disclosed by any rule lawfully promulgated by the SEC, nondisclosure of such conduct cannot be the basis of a criminal prosecution." Matthews, 787

F.2d at 49; <u>see</u> <u>also</u> <u>Crop Growers</u>, 954 F. Supp. at 347.

While Brown did not have a general duty to disclose a violation, once Brown made a representation that touched on the subject, he was required to speak accurately. <u>See</u> <u>In re</u> <u>Sotheby's Holdings, Inc. Sec. Litig.</u>, 00 Civ. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000). Ramp's code of ethics, which was attached as an exhibit to Ramp's 2003 and 2004 Forms 10-K, contained a provision that any gift received that was not nominal had to be reported to a supervisor. Brown signed a Section 302 certification that was attached to the 2004 10-K and stated that the 10-K "does not contain any untrue statement of a material fact." The plaintiffs have sufficiently alleged that the Section 302 certification, signed by Brown and attached to the 2004 10-K, implied that he had complied with the terms of Ramp's code of ethics and thus was a misstatement of fact.[6]

B.   Section 20(a)

Plaintiffs have alleged a violation of the Section 20(a) of the Exchange Act against Brown and Darryl Cohen. In order to sustain a claim under Section 20(a) a plaintiff must plead both a primary violation by a controlled person and direct or indirect control of the violator by the defendant. <u>See</u> <u>WorldCom</u>, 294 F.

---

[6] Because plaintiffs have sufficiently alleged a misstatement based on the 2004 Form 10-K certification it is unnecessary to reach at this time whether Brown's signature on the 2003 Form 10-K or the Section 302 certifications he signed that were attached to the 2004 Forms 10-Q were also misstatements of fact.

Supp. 2d. at 414. The plaintiffs' have only adequately pled one primary violation -- a violation of Section 10(b) against Brown. Defendants' motions to dismiss the Section 20(a) claim relating to Brown's primary violation are denied without prejudice to being renewed to address the Section 20(a) claim in light of the rulings in this Opinion. Defendants' motions should assume that the same pleading standard articulated in the <u>WorldCom</u> litigation for a Section 20(a) claim will be applied in this lawsuit. <u>See</u> <u>id.</u> at 413-16.

## Conclusion

The motion to amend the complaint is granted. The motions to dismiss by BDO Seidman LLP, Mitchell Cohen, Jeffrey Stahl, and Ron Munkittrick are granted with prejudice. The motion to dismiss by defendant Darryl Cohen is granted as to the Section 10(b) claim. The motion to dismiss by defendant Andrew Brown is denied.


Dated:     New York, New York
           July 21, 2006

                                    _____
                                            DENISE COTE
                                    United States District Judge