UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
IN RE RAMP CORPORATION                    :
SECURITIES LITIGATION,                    :     05 Civ. 6521 (DLC)
                                          :
This document relates to all actions.     :     OPINION & ORDER
                                          :
------------------------------------------X

DENISE COTE, District Judge:

Lead Counsel in this class action has moved for an award of attorney's fees. The claims against all but two defendants in this class action were dismissed, and the remaining claims have been settled for $2,075,000. For the following reasons, fees in the amount of $310,000, and expenses in the amount of $55,331.87 are awarded.

BACKGROUND

Class action lawsuits were filed against executives of Ramp Corporation ("Ramp") and the company's auditor BDO Seidman LLP ("BDO") in the summer of 2005, following Ramp's filing for bankruptcy. The class actions were consolidated, lead plaintiff was appointed, and Murray, Frank & Sailer LLP ("Murray Frank") was approved as Lead Counsel for the class. Murray Frank filed a consolidated complaint bringing two claims under the Securities Exchange Act of 1934 for violation of Sections 10(b) and 20(a). The claims were pleaded against five individual officers and directors of Ramp and BDO. A motion to dismiss the second consolidated amended complaint ("Complaint") was

addressed in an Opinion of July 21, 2006; familiarity with the Opinion is assumed.  In re Ramp Corp. Sec. Litig., No. 05 Civ. 6521 (DLC), 2006 WL 2037913 (S.D.N.Y. July 21, 2006) ("2006 Opinion").

The Complaint described in considerable detail the private investment, public equity transactions known as PIPEs, through which Ramp raised money, and asserted that some of these transactions were illegal and that Ramp failed to make appropriate disclosures regarding the PIPEs in its SEC filings. In addition, the Complaint described improprieties in connection with Ramp's purchase of the technology company Serca in 2003, its change in auditors in 2003, an SEC inquiry in 2003, misleading statements made to the company drugstore.com in 2003, efforts by a private investor in Ramp in early 2004 to control the composition of Ramp's Board of Directors, and false statements made in late 2004 concerning Ramp's purchase of Berdy Medical Systems.  Finally, the Complaint described a May 16, 2005 disclosure by defendant Andrew Brown ("Brown") that he had received an unsolicited gift of cash from an advisor to several Ramp investors in December 2003, at a time when he was president of the company.  This disclosure led to BDO resigning as the Ramp auditor, Brown's resignation from the company, Ramp's failure to file its quarterly report on schedule, and the company's default on over $6 million it had received in private

placements.  Ramp filed for reorganization under Chapter 11 on June 2, 2005.

The 2006 Opinion dismissed all claims against BDO and three of the five individual defendants.  The 2006 Opinion found that the only alleged misconduct that was connected to the loss alleged in the Complaint was the concealment of the bribe paid to Brown.  Id. at *12.  There was no allegation of scienter concerning the bribe and its concealment as to any defendant except Brown.  As a result, the Section 10(b) fraud claim survived as to Brown alone.  The control person Section 20(a) claim, which is governed by the pleading standards of Federal Rule of Civil Procedure 8, survived as to one other individual defendant.  Id. at *13.  As recently described in an opinion addressing the Federal Rule of Civil Procedure 11 findings, required by the Private Securities Litigation Reform Act ("PSLRA"), the Complaint's allegations against BDO were particularly flawed and barely complied with that Rule's forgiving standards.  In re Ramp Corp. Sec. Litig., No. 05 Civ. 6521 (DLC), 2007 WL 2962351, at *4 (S.D.N.Y. Oct. 10, 2007).  The 2006 Opinion also dismissed all claims based on any statement made before April 14, 2004, which was the date Ramp filed its 2003 Form 10-K signed by Brown, and left open the possibility that the class period could be shortened further.

Settlement negotiations followed shortly after the issuance of the 2006 Opinion, and resulted in an agreement in principle in November 2006. The settlement payment of $2,075,000 was approved at a Fairness Hearing held on June 29, 2007 and through an Opinion of July 3. In re Ramp Corp. Sec. Litig., No. 05 Civ. 6521 (DLC), 2007 WL 1964153 (S.D.N.Y. July 3, 2007).

The class had been given notice of the litigation and settlement through a notice of March 23, 2007 ("Notice"). There were four drafts that preceded the final Notice, beginning with a submission by Lead Counsel of a proposed notice on February 9, 2007. The first draft was so flawed that Lead Counsel was instructed to begin anew. Lead Counsel's second draft was reviewed in detail at a March 1 conference. At that conference the parties were advised that the Court would not approve the settlement based on the overbroad release of claims that Lead Counsel had negotiated with the defendants. Under their agreement there was essentially no limitation for the release of "unknown claims." In addition, the draft did not include a meaningful description of the plan of allocation. In response, the settlement agreement was revised to limit the release of unknown claims and Lead Counsel made substantial revisions to

its proposed plan of allocation and the description of that plan in the Notice.[1]

Lead Counsel seeks an award of attorney's fees of twenty-five percent of the amount paid in settlement, that is, $518,750. It also seeks $55,540.18 in reimbursement of expenses.

DISCUSSION

When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to "a reasonable fee -- set by the court -- to be taken from the fund." Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000) (citation omitted); see also 15 U.S.C. § 78u-4(a)(6) (in Exchange Act cases governed by the PSLRA, "[t]otal attorneys fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). Determination of "reasonableness" is within the discretion of the district court. Goldberger, 209 F.3d at 47.

There are two methods by which the court may calculate reasonable attorneys' fees in a class action, the lodestar

---

[1] The four drafts and final Notice have been docketed pursuant to the Court's request at the Fairness Hearing.

5

method and the percentage method.[2]  Applying either method, the court should consider the following factors, known as the Goldberger factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir. 2005) (citing Goldberger, 209 F.3d at 50).

---

[2]  The lodestar method "calculates attorneys' fees by multiplying hours reasonably expended against a reasonable hourly rate."  Wal-Mart Stores, Inc. v. Visa U.S.A., Inc. 396 F.3d 96, 123 n.27 (2d Cir. 2005).  The court may determine that an enhancement of the lodestar is warranted "based on factors such as the riskiness of the litigation and the quality of attorneys."  Id.; see also Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999) (applying the lodestar steps).

Under the percentage method, the fee award is simply "some percentage of the fund created for the benefit of the class."  Savoie, 166 F.3d at 460.  "The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."  Visa, 396 F.3d at 121 (citation omitted).  This method has been found to be a solution to various problems inherent in the lodestar method, which "creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits."  Id.

6

Lead Counsel originally calculated its "lodestar"[3] at over $1.013 million, representing over 2,200 hours of work spread over nearly two years. Lead Counsel's requested fee award of $518,750 represents a negative multiplier of 0.51 of that lodestar. Almost 129 hours, or roughly $60,000 of this amount, was attributed to work on the Notice. Lead Counsel no longer seeks any compensation based on its work on the Notice. At the Fairness Hearing, the Court requested that Lead Counsel prepare a revised lodestar figure by removing those hours that could be attributed to the dismissed claims and that it submit its contemporaneous time records for review by the Court.

Lead Counsel estimates that 920 hours were attributable to dismissed claims and over 1,229 hours to the surviving claims. It calculates the lodestar for the surviving claims at $524,405. The requested attorney's fee award of $518,750 represents a negative multiplier of 0.99 of the revised lodestar for the

---

[3] One Second Circuit panel recently expressed that it preferred the term "presumptively reasonable fee" to "lodestar." See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110, 117 n.4 and 118 (2d Cir. 2007). The relevance of this preference to the instant case need not be considered for two reasons. First, for the reasons to be discussed, the lodestar requested in this case has been discounted in the name of reasonableness, given the history of the litigation. Second, Arbor Hill concerned a suit brought under the Voting Rights Act; the decision's relevance to the securities class action context, which has its own robust and well-developed jurisprudence concerning the award of attorney's fees, is not immediately clear.

7

surviving claims. That is, Lead Counsel seeks roughly complete recovery for the work expended on those claims.

Four attorneys, including one partner, and one paralegal are responsible for the bulk of the work on the surviving claims. Roughly eighty percent of that work was performed during the period following the 2006 Opinion. The principal tasks during this period were the preparation of the Rule 26(a) initial disclosures, the preparation and review of initial interrogatories and document requests, the briefing on a renewed motion to dismiss the surviving Section 20(a) claim and on the class certification motion, preparing the named plaintiff for a deposition, and settlement negotiations. A review of the time records suggests that approximately 1,000 hours of work, or a lodestar of roughly $400,000, is properly attributable to work on the claims that survived the 2006 Opinion.[4] A fee award of $518,750 would represent a multiplier of roughly 1.3 of this lodestar. An award of the lodestar amount of $400,000 would represent an award of about one-fifth of the recovery in the class action.

Turning to the Goldberger factors, the investment by counsel in time and labor in this case must be substantially

---

[4] This lodestar represents a combined billable rate of $400 per hour, which is slightly less than requested by Lead Counsel. Lead Counsel's revised lodestar request represents an average hourly rate of about $426. (This reflects an average rate for the 1,229 hours spent on the surviving claims, billed at a total of $524,405).

8

discounted since less than half of that investment is properly attributable to any viable legal theory. When judged against the claims that survived the 2006 Opinion, this litigation was neither complex nor large. The core claim was brought against a single former officer of a company that had entered bankruptcy. A derivative Section 20(a) claim was brought against one other person. The lawsuit centered on an announcement that led to a $1.06 drop in the stock price in June 2005. It settled on the basis of the 2006 Opinion and before there was any substantial discovery.

Lead Plaintiff faced three principal risks in pursuing the claims that survived the 2006 Opinion. The first was that the class period could be shortened further to encompass just those weeks that followed the filing of Ramp's 2004 Form 10-K, a form which included Brown's certification under the Sarbanes-Oxley Act and represented his alleged failure to disclose his violation of Ramp's Code of Ethics.[5] See 2006 Opinion, 2006 WL 2037913, at *13 and n.6. The second major and related risk was that the Lead Plaintiff would fail to prevail on its theory that Brown violated his duty under Ramp's Code of Ethics when he accepted a cash gift and did not timely report it to the Ramp board of directors. The final identifiable risk was that the

---

[5] The 2006 Opinion did not reach the issue of whether there was any actionable misstatement in Ramp's 2003 Form 10-K or the 2004 Forms 10-Q.

9

Lead Plaintiff would be unable to prove that Brown's misconduct caused the losses alleged by the class.

The quality of representation afforded the class in this litigation has been less than stellar. A few examples will suffice. The Complaint was poorly written and ill-conceived. Unable to sue the company, which was in bankruptcy, Lead Counsel searched for a deep pocket and sued BDO without any viable theory of liability. Lead Counsel has escaped a finding that it violated Rule 11 only because of that Rule's forgiving standards.[6] In re Ramp, 2007 WL 2962351, at *4. The Complaint contained a potpourri of allegations against the remaining defendants without providing linkage to any theory of loss causation for most of the allegations. The work that Lead Counsel performed on the Notice to the class and in the negotiation of the release of claims was particularly deficient. As drafted by Lead Counsel, the Notice omitted most of the information that the class needed to assess the fairness of the settlement and to decide whether to opt out of the class action. The release that was negotiated by Lead Counsel was overbroad and held the potential to prejudice the interests of class members severely.

---

[6] It bears noting that Lead Counsel's briefing on the Rule 11 issues was far superior to its opposition to the motion to dismiss.

The settlement is estimated to provide recovery of about one-third of the losses sustained by the class, which is an excellent recovery. The requested fee represents approximately one-quarter of that recovery. A lodestar calculated from the work properly attributable to the claims that survived the 2006 Opinion equates to approximately one-fifth of the recovery.

The final factor to weigh in determining a reasonable fee in this litigation is public policy. Private plaintiffs and their counsel play an essential role in policing U.S. securities markets and insuring the integrity of those markets. See <u>Reeves v. Continental Equities Corp. of America</u>, 912 F.2d 37, 42 (2d Cir. 1990) ("Congress has long taken the view that private rights of action for violations of the federal securities laws are a necessary adjunct to the Commission's enforcement efforts.") (citation omitted). Lawsuits that are overreaching and ill-conceived, however, undermine public confidence in securities class actions. Thus, while class counsel, who bear the burden of pursuing the litigation and assume the risk of no or little recovery, are generally to be compensated for that commitment, even that consideration must be placed in its proper context. In particular, it is open to question whether this lawsuit would ever have been pursued by thoughtful counsel. On the one hand, there was a dramatic and devastating drop in the Ramp stock price following the June 2005 announcement. On the

11

other, however, there was no meritorious claim against any "deep pocket," and a well-pleaded claim of intentional wrongdoing against only one individual defendant.[7]

As far as the conduct of the lawsuit was concerned, Lead Counsel exercised good judgment in negotiating a settlement after the 2006 Opinion eviscerated the Lead Plaintiff's claims. Settlements are to be encouraged, and pursuing discovery, summary judgment practice, and a trial ran considerable risks for the class and would have substantially eroded its chance to obtain a reasonable sum in settlement of the litigation.

Weighing each of these factors, $310,000 in attorney's fees are awarded to Lead Counsel. This represents about fifteen percent of the $2,075,000 recovered for the class.[8] This award recognizes Lead Counsel's wisdom in settling this litigation and skill in negotiating the amount of the settlement, but properly

---

[7] Nothing in this Opinion should be construed to mean that attorney's fees in securities class action suits necessarily rise and fall on the disposition of a motion to dismiss. Rather, the attorney's fees awarded in this case reflect the generally poor quality of the work performed by Lead Counsel over the course of the litigation, including, but not limited to, Lead Counsel's transparent effort to rope BDO into the lawsuit.

[8] While $310,000 is less than the roughly $400,000 that constitutes the lodestar for the work on the surviving claims, it is also considerably more than the recovery Lead Counsel had originally requested based on its then-computed lodestar. Based on a lodestar calculation of $1.013 million, Lead Counsel requested $518,750, which represented a negative multiplier of 0.51. An award of $310,000 represents a negative multiplier of roughly 0.78 for a lodestar of $400,000.

removes incentives for bringing marginally meritorious litigation and reflects the quality of representation generally given the class in this lawsuit.

Lead Counsel originally sought reimbursement of $46,020.26 for expenses. At the June 29 hearing, the Court asked for explanations for several of the items underlying that request. In its supplemental submission, Lead Counsel requests $55,540.18 in unreimbursed costs and expenses. The largest change is attributable to the discovery of $9,690.32 in fees paid to the damages expert that were omitted from the original request. Expenses are awarded in the amount of $55,331.87. The requested expenses and their supporting documentation have been reviewed, and they are approved except for an expenditure of $208.31.[9]

CONCLUSION

Attorney's fees are awarded in the amount of $310,000. Expenses are awarded in the amount of $55,331.87.

SO ORDERED:

Dated:   New York, New York
         January 4, 2008

*Denise Cote*
DENISE COTE
United States District Judge

---

[9]  The $208.31 is described as charges for telephone conferences in the Global Crossing litigation.

13